# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**UNITED STATES OF AMERICA**

-vs-                                                                 Case No. 6:08-cr-216-Orl-28KRS

**COREY JERMAINE PARKER**
**ALTON TRENARD GAINER**

_____

# ORDER

Arguing that his Fourth Amendment rights were violated by the Palm Bay Police Department, Defendant Corey Jermaine Parker moves to suppress[1] evidence seized by law enforcement officers during three property searches. The searches were conducted pursuant to separate warrants from a state magistrate[2] granting permission for law enforcement officers to search 2256 Monroe Street, Unit A, Palm Bay, Florida ("Unit A"); 2256 Monroe Street, Unit B, Palm Bay, Florida, ("Unit B"); and 2405 Anchor Road, Palm Bay, Florida ("the Anchor Road residence"). Notwithstanding the warrants, Defendant contends that the searches were conducted without probable cause and that the evidence seized during the searches should be excluded from Defendant's upcoming criminal trial.[3] The Government responds[4] by arguing that Defendant's Motion to Suppress should be denied

---

[1] (Def.'s Mot. to Suppress Evidence, Doc. 33).

[2] The warrants were issued by a county judge in Brevard County, Florida.

[3] Defendant is charged with: Count One, conspiracy to possess cocaine with intent to distribute; Count Two, possession with intent to distribute cocaine; and Count Three, use of a firearm in relation to drug trafficking. (Indictment, Doc. 1).

[4] (Gov't's Resp. to Def.'s Mot. to Suppress, Doc. 45).

because the warrants were supported by probable cause and because even if the warrants were defective, the good faith exception to the exclusionary rule applies.[5]

The Court held an evidentiary hearing on the motion on January 20, 2009.[6] At the conclusion of that hearing, the Court announced that Defendant's motion to suppress was denied as to Unit A but would be taken under advisement insofar as it pertained to Unit B and the Anchor Road residence. After considering the evidence and argument of counsel, the Court now concludes that the remainder of the motion must be denied in part and granted in part.

I. Facts

On August 6, 2008, Officer Matthew Waldron of the Palm Bay Police Department conducted a traffic stop. The person whom he stopped, Jacob Bitomski, consented to a search and was found to be in possession of cocaine. Officer Mark F. Scammell then arrived at the scene of the stop and engaged in a discussion with Bitomski. The officers did not arrest Bitomski, but they asked him where he had obtained the cocaine. Bitomski told the officers that he had purchased the cocaine from Defendant at Unit A. Upon receiving this information, Officer Scammell asked Bitomski to participate in a controlled purchase of

---

[5]In its response memorandum, the Government also asserted that in his motion Defendant failed to state a factual basis for his standing to challenge the searches of Unit A and Unit B. (See Doc. 45 at 5-6). However, at the beginning of the January 20 evidentiary hearing, it was agreed that Defendant has the necessary standing to object to those searches; he is the owner of Unit A and Unit B, and the search warrants themselves state that the properties are under his control.

[6](See Mins., Doc. 59).

cocaine from Defendant, and Bitomski agreed to cooperate. The controlled purchase was orchestrated that same day, August 6.

In preparation for the purchase, officers searched Bitomski and his car and then gave him $150 in marked currency to use in making the purchase of cocaine from Defendant. While under the visual surveillance of the officers, Bitomski drove one and a half miles to Unit A and, while inside, purchased three grams of powder cocaine from Defendant. While still under surveillance, Bitomski returned to the officers and delivered the cocaine to them. Another search was conducted of Bitomski and his car, and no currency was found in Bitomski's possession. After the controlled buy, Bitomski, using a photograph, identified Defendant as the person from whom he had purchased the cocaine.

Six days later, on August 12, Palm Bay police officers conducted a second controlled buy of cocaine from Defendant, again through Bitomski. Bitomski and his car again were searched and found to be free of cocaine. The officers then gave Bitomski marked funds with the understanding that the funds were to be used to purchase three grams of cocaine from Defendant. The officers observed Bitomski as he drove to and entered Unit A. Upon exiting Unit A, Bitomski returned to the officers, delivered to them three grams of cocaine, and informed them that he had purchased the cocaine from Defendant.

Later on August 12, Officer Scammell presented an affidavit to a magistrate seeking a warrant to search Unit A. (Aff. in Supp. of Search Warrant for Unit A, Attach. to Gov't's Ex. 1). The affidavit included an account of the first controlled purchase[7] of cocaine but did not

---

[7]Officer Scammell explained at the evidentiary hearing that the affidavit submitted in support of the search of Unit A was prepared prior to the second controlled buy. The

-3-

disclose Bitomski's identity. (Id. at 3-4). In the affidavit, Officer Scammell referred to Bitomski as a confidential informant, but he failed to include facts supporting Bitomski's reliability. Officer Scammell met with an assistant State Attorney ("ASA") who reviewed and approved the affidavit and proposed warrant before they were presented to the magistrate. Based on the affidavit, the magistrate concluded that there was probable cause to believe that cocaine was being kept in Unit A, and the magistrate signed the warrant authorizing the search of Unit A that same day—August 12. (Search Warrant for Unit A, Gov't's Ex. 1).

At the same time that the officers obtained a search warrant for Unit A, they also requested a warrant authorizing the search of Defendant's residence on Anchor Road. The affidavit in support of this requested warrant—again, signed by Officer Scammell—described both the first and second controlled purchases of cocaine that had been conducted with Bitomski. (See Aff. in Supp. of Search Warrant for Anchor Road residence, Attach. to Gov't's Ex. 2). In addition, this second affidavit included the following allegations pertaining to Defendant's residence:

> [Bitomski] stated that [Defendant] would come from his main residence and arrive at 2256 Monroe Street at approximately noon on a daily basis . . . [and] would then stay at 2256 Monroe Street where he would sell cocaine until approximately 6:00 P.M. at which time he would return to his main residence. . . . [Bitomski] stated the [Defendant] would not let anyone know where he lived and [Bitomski] only knew that [Defendant's] main residence was located somewhere in the southeast section of the city. There has also been a second reliable confidential informant relating the same information about [Defendant] and his activities for approximately 6 months. . . . Through

---

affidavit was not amended to reference the second transaction before being presented to the magistrate.

> investigation and surveillance it was found that [Defendant] does indeed go to 2256 Monroe Street during the day and return to 2405 Anchor Road after completing his narcotics transactions. The location of 2405 Anchor Road is such that it is in a secluded area of the city and is surrounded by privacy fence and woods. The purpose of searching 2405 Anchor Road is to locate the investigative funds which were exchanged for cocaine with [Defendant]. There is also a reasonable expectation that more cocaine and possibly firearms will be located at 2405 Anchor Street [sic].

(Id. at 5-6). Scammell failed to advise the magistrate that the second informant had provided his information from prison, where he had resided for approximately two years prior to the preparation of the affidavit. The magistrate issued a search warrant for the Anchor Road residence based on this affidavit. (Gov't's Ex. 2).

A third controlled purchase was accomplished by Bitomski on August 13, 2008. This purchase was observed by Officer Scammell and was conducted in substantially the same manner as the prior purchases. Approximately one hour after completion of the third controlled purchase of cocaine, the Palm Bay Police Department executed a search of Unit A pursuant to the warrant that had been issued by a magistrate the day before. During the search, the officers found and seized nine firearms, various ammunition, crack cocaine, cocaine hydrochloride, marijuana, hydrocodone, a Tippman paint gun, and cash from Unit A.

Before seeking the search warrant for Unit A, the Palm Bay officers were aware that there was more than one unit on the Monroe Street property.[8] The entrance to Unit A is at

---

[8]The hearing testimony of the officers varied a bit on this point, but the Court finds that the officers were aware that there was more than one unit at the Monroe Street address. Officer Scammell testified that they were unsure how many units were in the building, but

the east end of a long, rectangularly-shaped building. The entrance to the other unit, Unit B, is midway down the south side of the building and clearly marked with the letter "B" on the door. In a discussion with an assistant state attorney ("ASA") prior to execution of the search warrant, Officer Scammell asked whether the warrant for Unit A permitted a search of Unit B. The ASA responded that it did not and that the officers were not permitted to enter Unit B unless after entering Unit A they discovered an interior door joining the two units.

After the officers entered Unit A through the front door on the east side of the building to begin their search, Defendant jumped out of a window on the south side. The window was a few feet to the right (east) of the marked doorway of Unit B. As Defendant came out of the window and began to move to the west, he was observed by Officer Waldron, who told him to "freeze." When Officer Waldron saw Defendant's hands around his waist, Waldron shot him with a tazer gun and took him into custody. After Defendant was taken into custody, officers with the Palm Bay SWAT team came from the front of the building, broke down the door, and entered Unit B. The Government referred to this action as a "protective sweep" conducted for the safety of the officers. While inside Unit B, the officers broke into a locked closet, where they discovered a number of firearms and a box for a Tippman paintball gun corresponding to the Tippman paintball gun observed in Unit A.

That same day, after the sweep of Unit B was conducted, Officer Scammell prepared and presented to a magistrate an affidavit in support of an application for a search warrant

---

Officer Moya testified that he knew there was a Unit B. Both of these officers also testified that before the execution of the warrant, there was specific discussion with an assistant state attorney about not going into the second unit unless the two units were connected by a door.

for Unit B. The affidavit recounted the first controlled buy of cocaine by Bitomski and also described the execution of the search warrant for Unit A, the entering of Unit B for the purpose of "clearing" it, and the items observed in Unit B. In the affidavit, Scammell explains that upon exiting the window:

> [Defendant] got to his feet and made a turn as if to attempt to enter Unit "B". Before [Defendant] could make entry to Unit "B" he was taken into custody. The door for Unit "B" and the window which [Defendant] jumped through were directly next to each other and SWAT Team members could not determine at this time if [Defendant] had come out of Unit "B" or Unit "A"[.] The Palm Bay Police SWAT Team then entered Unit "B" to clear the apartment due to [Defendant's] possible attempt to enter the apartment and the possibility that he had actually come from Unit "B" and to ensure the safety of the officers and the public, which by this time had started to gather to observe the incident. As the apartment was cleared, multiple firearms, similar to those found in Unit "A", were observed in open view. Also in plain view directly inside the apartment door was a box for a Tippman paintball rifle. Inside Unit "A", a Tippman paintball rifle was located on the couch in the living room. Apartment "B" was then vacated after a protective search.

(Aff. in Supp. of Search Warrant for Unit B, Attach. to Gov't's Ex. 3, at 4-5). Upon review of Officer Scammell's affidavit, the magistrate signed a warrant authorizing a search of Unit B. (Gov't's Ex. 3). A search was executed later that day, and evidence was seized from Unit B.[9]

The search warrant for the Anchor Road residence was also executed on August 13. At that location, officers discovered $22,000 in cash, including some of the marked currency delivered to Defendant by Bitomski in exchange for cocaine during the controlled purchases.

---

[9]During the search of Unit B, Palm Bay officers seized six firearms, magazines, ammunition, cocaine hydrochloride, drug paraphernalia, and the Tippman paint gun box.

## II. Law

Any discussion as to whether evidence seized by law enforcement during a search may be admitted as evidence in a criminal trial begins with the text of the Fourth Amendment:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. This Amendment serves as a general proscription against warrantless searches and requires that warrants to search be based on probable cause.

What constitutes probable cause is not always easily determined. The Supreme Court has referred to probable cause as being "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). What is required in assessing probable cause is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the magistrate] . . . there is a fair probability that the contraband or evidence of a crime will be found in a particular place." Id. at 238. Given the imprecise nature of this definition, it is not surprising that reasonable judges may differ as to whether a set of facts creates probable cause justifying the issuance of a search warrant.

The Fourth Amendment requirement of probable cause for a search warrant protects the interests of individuals in their homes, properties, and possessions against unjustified police intrusion. See Steagald v. United States, 451 U.S. 204, 213 (1981). Ordinarily, items

seized in violation of the Fourth Amendment will not be admitted as evidence in a criminal proceeding against a person with standing to object to the search. See Weeks v. United States, 232 U.S. 383 (1914), overruled in part by Mapp v. Ohio, 367 U.S. 643 (1961); Wong Sun v. United States, 371 U.S. 471, 484-85 (1963). This is known as the exclusionary rule—a judicially-created tool to deter law enforcement officers from violating the Constitution.[10]

The exclusionary rule extends to items seized pursuant to a warrant when information included in the affidavit offered in support of the warrant was obtained as a result of an unlawful search. See, e.g., Wong Sun, 371 U.S. at 484-88. Such items are metaphorically referred to as "fruit of the poisonous tree" and generally cannot be used by the prosecution in its case-in-chief. Segura v. United States, 468 U.S. 796, 804 (1984) ("[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.' It 'extends as well to the indirect as the direct products' of unconstitutional conduct.'") (citations omitted). If information is gained as a result of an illegal search and that information forms the basis upon which a magistrate issues a search

---

[10]The resiliency of the exclusionary rule has eroded over time as emphatically evidenced by Leon and most recently by Herring v. United States, 129 S. Ct. 695 (2009). In Hudson v. Michigan, 547 U.S. 586 (2006), Justice Scalia, echoing critics of the rule, called into question the current necessity of the rule, citing "the increasing professionalism of police forces, including a new emphasis on internal police discipline," "wide-ranging reforms in the education, training, and supervision of police officers," and the deterrence of potential civil liability. Id. at 598-99. The dissent in Hudson, however, relying on traditional application of the exclusionary rule, described the rule as the "strongest legal incentive to comply with" Fourth Amendment restrictions on the conduct of law enforcement officers. Id. at 605 (Breyer, J., dissenting).

warrant, the evidence discovered during the subsequent search is subject to the exclusionary rule unless it would have inevitably been discovered through lawful means or there is an independent source for the illegally-obtained information. See Nix v. Williams, 467 U.S. 431, 443-44 (1984).

Under certain circumstances, officers may legally enter a residence without the benefit of a warrant. The law excuses the requirement of a search warrant and allows entry by law enforcement officers when there are exigent circumstances creating a "compelling need for official action and no time to secure a warrant." Bashir v. Rockdale County, 445 F.3d 1323, 1328 (11th Cir. 2006) (citations and internal quotation omitted). However, "[t]he exigent circumstances exception only applies if the police reasonably believed that an emergency situation justified warrantless action." United States v. McCoy, 259 F. App'x 264, 267 (11th Cir. 2007) (citing United States v. Holloway, 290 F.3d 1331, 1338 (11th Cir. 2002)). Exigent circumstances may exist when there is "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." Bashir, 445 F.3d at 1328 (citation and internal quotation omitted).

When making an arrest, officers are permitted to make a "protective sweep" of the premises to ensure their own safety. Noting that only unreasonable searches are prohibited by the Fourth Amendment, the Supreme Court has held that protective sweeps are reasonable if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Maryland v. Buie, 494 U.S. 325, 334 (1990). A protective sweep is limited "'to a cursory visual inspection of

those places in which a person might be hiding.'" United States v. Delancy, 502 F.3d 1297, 1306 (11th Cir. 2007) (quoting Buie, 494 U.S. at 327). In conducting a protective sweep, law enforcement officers are also permitted to search the area within the immediate reach of a person they have reason to believe poses a danger. See Michigan v. Long, 463 U.S. 1032, 1049-52 (1983).

The exclusionary rule is also subject to the "good faith" exception announced in United States v. Leon, 468 U.S. 897 (1984). In Leon, the Supreme Court modified the exclusionary rule "so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." Id. at 900, 905. Essentially, the Supreme Court was unwilling to hold law enforcement officers to a higher standard than magistrates issuing warrants. The affidavit presented to the magistrate in Leon "provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." Id. at 926. The Court determined that "[u]nder th[o]se circumstances, the officers' reliance on the magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion [wa]s inappropriate." Id.

The Supreme Court in Leon recognized that the purpose of the exclusionary rule is to deter unlawful police conduct, and that purpose would not be served when the law enforcement officers engaged in an "objectively reasonable law enforcement activity" undertaken in good faith and in reliance on a warrant issued by a magistrate. Id. at 919-20. The Leon good faith exception to the exclusionary rule is, however, not without limitations.

The exception does not apply in four situations: "(1) where 'the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth'; (2) 'where the issuing magistrate wholly abandoned'" his detached and neutral judicial role; "(3) where the affidavit supporting the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) where, depending upon the circumstances of the particular case, a warrant is 'so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.'" United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (quoting Leon, 468 U.S. at 923). Succinctly stated, if the magistrate has not "abandoned his neutral and detached role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." Leon, 468 U.S. at 926. It is important to note, however, that where evidence is seized pursuant to a search warrant issued in reliance on information obtained during a prior illegal warrantless search, the good faith exception does not come into play. See United States v. McGough, 412 F.3d 1232, 1236-40 (11th Cir. 2005).[11]

---

[11] This view is not uniform among the circuits, however. See generally United States v. McClain, 444 F.3d 556, 564-66 (6th Cir. 2006) (reaching contrary conclusion and collecting cases).

### III. Discussion

It is the obligation of this Court to review the searches and seizures authorized by warrants issued by the state magistrate. Elkins v. United States, 364 U.S. 206, 223-24 (1960). This review must be independent and is controlled by federal law. Id. In considering a motion to suppress evidence seized pursuant to a warrant on grounds that probable caused did not exist, the judge considering the motion must give great deference to the issuing magistrate's decision. United States v. Ventresca, 380 U.S. 102, 108-09 (1965).

*A. Unit A*

Defendant attacks the magistrate's finding of probable cause to search Unit A. Defendant correctly points out that there were no facts included in the affidavit establishing the reliability of Bitomski, whose identity at that point was undisclosed. Defendant also understandably complains that Bitomski has apparently left the area and his whereabouts are unknown to law enforcement; it is thus impossible for defense counsel to question him regarding his account of the events and his reliability. Additionally, counsel also noted that by the time Bitomski left town, some members of the Palm Bay Police Department had lost confidence in him and had ceased to use him as an informant.

Notwithstanding these criticisms, Officer Scammell's affidavit sufficiently established probable cause that evidence of criminal conduct was located in Unit A at the time the warrant was signed. The affidavit describes a controlled buy that was observed by the officers, through which cocaine was obtained from someone Bitomski identified as Defendant. The Motion to Suppress must be denied as to the evidence seized during the

search of Unit A.[12]

### B. Unit B

The question of whether the evidence seized from Unit B must be suppressed presents different issues. Officer-witnesses testified that the initial entry and search of Unit B constituted a protective sweep that was executed because of concerns for officer safety. The Government argues that because the initial entry was a protective sweep, the observations made at that time formed a legitimate, reasonable basis for probable cause for the subsequent issuance of the warrant to search Unit B. The facts brought to light at the evidentiary hearing do not support this conclusion.

From the outset, Officer Scammell wanted to search Unit B in conjunction with the search of Unit A. Knowing that Defendant owned the whole building, he asked the prosecutor who reviewed the affidavit offered in support of the search warrant for Unit A whether that warrant also permitted search of Unit B. The prosecutor's response was clear—the officers could not search Unit B unless they found a door connecting the two units. Upon entry of Unit A, it was obvious that there was no such connecting door, and the officers understood that the warrant did not permit them to enter Unit B.

In deciding whether entry of Unit B was truly a protective sweep made for officer protection, it is necessary to consider whether there was a basis to believe that there was a person in Unit B that posed a danger to them. No facts were elicited in the testimony supporting such a belief. There were no reports of any officer seeing or hearing a person

---

[12]This ruling was announced at the conclusion of the evidentiary hearing on the motion to suppress.

in Unit B. No other facts elicited during the hearing gave rise to a reasonable belief that there was another person in Unit B.

Officers testified that they were uncertain as to whether the window from which Defendant exited opened into Unit A or Unit B. Although it is unclear as to how this would make a difference with regard to assessing concerns for officer safety, it is a difficult assertion to accept. Officers had already entered Unit A by the time Defendant exited the window. According to officer witnesses, several minutes[13] passed between the time Defendant was subdued and the time the officers broke through the locked door into Unit B. This is a much longer time than was reasonably necessary to observe that the window Defendant exited was located in Unit A.

Officer Waldron shocked Defendant with a tazer gun just as he was exiting the window, enabling him to immediately take Defendant into custody. Thereafter, Officer Waldron remained with Defendant outside the window and near the door to Unit B until Defendant was moved to the front of the building. After Defendant was moved, Officer Waldron remained in approximately the same spot until the SWAT Team made its entry into Unit B. Officer Waldron did not express a fear that someone in Unit B posed a threat, and no superior officer ordered him to move from the location outside of Unit B. These facts are inconsistent with the assertion that the entry of Unit B was made out of concern for officer safety.

The initial entry into Unit B by the Palm Bay police constituted an unreasonable

---

[13]These estimates ranged from one minute to ten minutes.

search. The Government's defense of the search is further weakened by the fact that the items it claims gave rise to probable cause were not in plain view. The officers intruded further when they broke into a locked closet, where they found firearms. Notwithstanding the fact that officers observed the firearms only after breaking into the closet, they were described in the affidavit in support of a warrant to search Unit B as being in "plain view." Apparently, the only item truly in plain view was the box for the Tippman paint gun. The box allowed the officers to infer a connection between Unit A and Unit B, but they already knew that Defendant was the owner of the entire building. Moreover, the items observed in Unit B upon the initial entry were not contraband and did not otherwise constitute probable cause for a search.

The initial entry to Unit B by members of the Palm Bay Police Department was made without a warrant. The facts do not support the Government's assertion that the entry was made as a protective sweep, and no other exigent circumstances were advanced in support of the warrantless entry. Therefore, the search was unreasonable, and the evidence observed during the sweep and described in the affidavit in support of a warrant to search Unit B could not properly be relied upon as a basis for probable cause. The evidence seized during the search of Unit B was "fruit of the poisonous tree" and must be suppressed.[14]

### *C. The Anchor Road Residence*

The thorniest issue presented by Defendant's Motion to Suppress concerns the search of the Anchor Road residence. The affidavit submitted by Officer Scammell does not

---

[14]There is no evidence of an independent source for information regarding what was inside Unit B, nor any indication that the evidence would have been "inevitably discovered."

-16-

compel a finding that there was a fair probability that contraband or evidence of criminal conduct would be found at Defendant's residence. In addition to describing the two controlled buys from Unit A, the affidavit includes an account of Defendant's routine activities. According to Bitomski, Defendant traveled daily to Unit A "where he would sell cocaine until approximately 6:00 P.M. at which time he would return to his main residence [Anchor Road]." (Aff., Attach. to Gov't's Ex. 2, at 5). According to the affidavit, Defendant did not let anyone know the location of his residence. This routine was confirmed by the investigation of law enforcement officers and by a second informant who had been in prison for approximately two years prior to Defendant's arrest. None of the information in the affidavit suggests that Defendant engaged in criminal activity at his Anchor Road residence. The inference to be drawn from the affidavit is that Defendant did not conduct his "business" from his home. It is possible that Defendant kept funds collected from the sale of cocaine in his home instead of Unit A or a bank, but such a conclusion would be based purely on speculation.[15] Officer Scammell's affidavit submitted to the magistrate did not establish probable cause for the search.

---

[15]Courts have reached differing conclusions on the question of the searchability of a drug dealer's residence where the drug transactions occur at a different site. Compare, e.g., United States v. Lalor, 996 F.2d 1578, 1583 (4th Cir. 1993) (noting that "residential searches have been upheld only where some information links the criminal activity to the defendant's residence," and collecting cases), with United States v. Gunter, 551 F.3d 472, 481 (6th Cir. 2009) ("Because the quantity of drugs and the repeated nature of the transactions make it reasonable to conclude that Gunter was engaged in ongoing drug trafficking, it was reasonable to infer that evidence of illegal activity would be found at Gunter's residence."), and United States v. Jones, 159 F.3d 969, 975 (6th Cir. 1998) (concluding that "[t]he recited statements supporting the search warrant and the fact that '[i]n the case of drug dealers, evidence is likely to be found where the dealers live' support[ed] a finding of probable cause to support the issuance of the warrant") (citation omitted).

This Court's determination that there was not probable cause justifying the warrant and search of the Anchor Road residence does not, however, end the inquiry. The question remains whether the Leon good faith exception to the exclusionary rule applies. If it does, the evidence should not be suppressed even though the warrant was issued without probable cause. Of the four situations in which the good faith exception does not apply, only two are relevant in this case—whether the magistrate wholly abandoned his detached and neutral role, and whether the warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.[16]

The first of these considerations requires little discussion. While it is this Court's belief that few magistrates would have issued a warrant based on Officer Scammell's affidavit, there is no evidence that the decision was the result of bias in favor of law enforcement as opposed to simply not viewing this request separately from the other two applications for warrants, both of which were based in part on observations of law enforcement officers. Moreover, by the time the magistrate signed the warrant, he knew Defendant sold cocaine at one location and lived at another. While the facts were not sufficient to constitute probable

---

[16]Defendant also argues that Officer Scammell misled the magistrate by not explaining that the second confidential informant could not have provided relevant information regarding Defendant's conduct because he had been in prison for approximately two years prior to the seeking of the warrant; the informant could not have observed the conduct of Defendant during a relevant time period. The Court agrees that the informant's imprisonment should have been disclosed to the magistrate. The failure to make this disclosure is not fatal, however, because it was of such little value in assessing the existence of probable cause. After describing the scant information provided by Bitomski pertaining to Defendant's residence, the affidavit stated that "[t]here has also been a second reliable confidential informant relating the same information about [Defendant] and his activities for approximately 6 months." It is unlikely that the magistrate gave this vague information any weight.

-18-

cause, it made sense that Defendant might have taken proceeds from cocaine sales to his home. There is no evidence supporting a conclusion that the magistrate wholly abandoned his neutral role.

The remaining and most difficult question in the good faith analysis is whether the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923. This question is answered in the negative. By the time the officers presented the Anchor Road affidavit to the magistrate, they had observed two controlled purchases of cocaine from Unit A. They also were convinced, based on what they had been told, that Defendant had been engaged in the sale of cocaine for a significant time. Based on their investigation, the officers believed that Defendant had a habit of leaving Unit A where he daily engaged in the sale of cocaine and returning to his Anchor Road residence. Having this information, it was not objectively unreasonable for the officers to believe that there existed a fair probability that the proceeds from illegal drug sales were located in Defendant's residence.

The good faith exception to the exclusionary rule applies to the search of Defendant's residence on Anchor Road, requiring that the Motion to Suppress the evidence found there be denied.

### IV. Conclusion

Defendant's Motion to Suppress (Doc. 33) is granted in part and denied in part. To the extent the motion seeks suppression of the evidence seized from Unit A and from Defendant's 2405 Anchor Road residence, the motion is denied. To the extent the motion

seeks suppression of evidence seized from Unit B, the motion is granted.

**DONE** and **ORDERED** in Orlando, Florida on this 17th day of February, 2009.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
Corey Jermaine Parker